02-10-353-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND DISTRICT OF
 TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-10-00353-CR

 

 


 
 
 KYRA POINTON
 
 
  
 
 
 APPELLANT
 
 


                                                                                                                             

V.

 


 
 
 THE
 STATE OF TEXAS
 
 
  
 
 
 STATE
 
 


 

 

------------

 

FROM COUNTY CRIMINAL COURT NO. 2 OF DENTON COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

I.  Introduction

In one point, Appellant Kyra Pointon
appeals her conviction of seven counts of cruelty to livestock animals.  We
affirm.

II.  Factual and Procedural History

On March 10, 2009, deputies from the
Denton County Sheriff’s Office seized seventeen horses from Pointon and
arrested her for animal cruelty.  The State charged Pointon with seven counts
of cruelty to livestock animals by intentionally or knowingly failing
unreasonably to provide necessary food, water, or care for seven horses in her
custody.  See Tex. Penal Code Ann. § 42.09(a)(2) (West 2011).  The
seven horses were described as a sorrel gelding (count 1), a bay-colored paint
colt (count 2), a bay quarter horse gelding (count 3), a black mare (count 4),
a gray pony (count 5), a gray fine-boned mare (count 6), and a grulla mare
(count 7).

A.  General Horse Health

Deputy Kirk Sissney, the animal
crimes investigator for the Denton County Sheriff’s Office who specializes in
large animal cruelty cases, testified that he had completed basic animal
control officer training in addition to an animal body scoring certification.  His
training taught him how to look at the body condition score of the animal and see
how the animal’s muscle layers and fat layers are built; to determine whether
the animal has clean water, proper nutrition, proper veterinary care with
regard to vaccination history; and to handle animal-specific situations, such
as hoof work on a horse.  He had also received specific training on horse
nutrition, anatomy, and health care.  Deputy Sissney explained that body
condition scoring is “taking an overall look at an animal and determining . . . on
a set scale and pattern as to what level that animal’s muscle mass, fat
retention, overall nutritional health is.”

Deputy Sissney educated the jury
about body condition scoring for a horse:

To body condition score an animal . . . we start with
the front of the animal looking at the head.  You’re going to be looking along
the top line of the animal which would be the neck, the withers, the back, the
rump, the croup, and the tail head which would be all along the top. . . .  [W]hen you’re looking at a horse you will start with
the area around the face.  You’re going to look for the area around the eyes
that will be sunken in, kind of a bug-eyed appearance to them.[ ]   The next
area we move to would be the neck region.  You would look for the depth of the
neck to see how—see that it—you make sure it comes down, a good full neck. 
Also you would look for loss of muscle mass in this area right here.  You would
be able to see the spine in the neck on a very thin horse.  Next you would move
to the withers.  The shoulder blades—where the shoulder blade comes
up . . . this area right here where you see actually this crease
that’s right here, this is going to be the scapular ridge.  That’s the front
blade of the shoulder.  As the horse loses muscle mass you’re actually going to
see that ridge become very pronounced, and that’s going to lead you up to the
withers right here where you will see . . . to about the midline of the croup
is you’re going to have—where the spinal process actually stands up above the
horse’s shoulders—above the horse’s back like this. . . .  The hip plane, the
croup area, you will see what—you will see what is called the hooks and the
pins which is  basically the two front points, the front point and the back
point on the large bones that the hip bone that—as the—as the muscle mass
deteriorates you will see those points sticking out. . . .  As the muscle mass
deteriorates you will see a plane surface where those points are sticking out
very prominently. . . . The last place we go as far as the back is the tail
head.  Any time you see this tail head, that’s a pretty indicative sign of a
horse that’s in bad body shape.  It should look like the hair comes strai[gh]t
out of their butt, there should not be any tail head showing.  You shouldn’t
see that.

Deputy Sissney testified that after
the initial assessment described above, he would move on to other areas such as
hoofs, teeth, ribs, and abdominal area to get an overall picture of the
animal’s general health.  He also explained that horses need healthy hooves so
that they can walk to get to food and water, that walking contributes to a
horse’s ability to digest its food, and that a horse’s hooves should be checked
for cracks, chips, and splits daily or every other day and the bottom of the
hooves should be checked for stones and damage because if left unchecked, sore
spots or infections could develop.  Deputy Sissney stated that severe
overgrowth of hooves is extremely painful for a horse and that it is not
difficult to maintain a horse’s hooves on a regular basis.

Deputy Sissney explained that
although a horse’s ribs might be the first thing one would see, it would be one
of the last things to check because “an animal’s body weight can fluctuate due
to parasite loads, nutrition, or if it’s just a lack of water,” so the animal’s
condition had to be judged by the totality of the circumstances.  Teeth would
be the last thing to check; if the horse’s teeth were in bad shape, then the
horse would not be able to process food to a degree that the enzymes and
bacteria in its gut could break down the food.

Deputy Sissney explained that the
scale for body condition scoring is one to nine, with one being a “walking
skeleton” and nine being “very obese.”  A healthy horse weight would be a five;
for anything that fell below a five, “you would have to look for reasons why
that animal is not maintaining its body weight.”  Deputy Sissney said that when
a horse is not in ideal body condition or is in a compromised nutritional
state, its nutritional needs will differ from a regular, healthy horse and it
will not have the gut load bacteria to handle eating a bale of hay.

Dr. Sherri Swanton, a veterinarian,
testified that a body condition score of four or five out of nine is an ideal
score for an animal in good shape and receiving exercise.  She also said that
horses, depending on the size and activity, need at least ten gallons of water
a day.  And depending on whether a horse is receiving concentrated feed, it
needs to consume around 1.5% to 3% of its body weight in feed per day, so a
1000-pound horse needs to receive around twenty pounds of dry feed daily.  She
also stated that parasites can keep a horse from receiving adequate nutrients
and can make a horse anemic because parasites are usually blood feeders;
regular de-worming practice is part of good horse health.  Dr. Swanton said
that when hooves are left in poor condition, this increases the risk of
abscesses or foundering, the tearing of the hoof wall, which is similar to
ripping off a fingernail.  Dr. Swanton said that when a horse is in pain, it
will not want to eat or stand.

B.  The Seven Seized Horses

Dr. Swanton testified that in early
March 2009, she examined seven horses that the Denton County Sheriff’s Office
had seized, gave them complete physical exams “from nose to tail,” and took
blood and fecal samples, and she testified, as set out below, about the horses’
conditions.  The trial court admitted Dr. Swanton’s report, State’s Exhibit
184, into evidence.  Deputy Sissney was involved in the seizure of the horses,
and he described their conditions at the time of the seizure.

1.  Count 1:  Ben

The jury saw photos of Ben, an
emaciated sorrel gelding.  The photos showed that Ben’s mane was matted, that
he had burrs in his coat, and that he had a distinct lack of musculature. 
Deputy Sissney stated that even with Ben’s long winter coat, “you can still see
a clear demarcation between the ribs, probably deep enough to lay your fingers
in.”  He said that Ben was very underweight based on his bug-eyed appearance
and the thinness of his neck, noting, “You can actually see where the spine is
starting to come through,” and pointing out the ridge starting to form where
the muscle had begun to deteriorate away from Ben’s spine.  He opined that
Ben’s winter coat might have camouflaged additional issues.

State’s Exhibit 8 showed Ben’s front
right hoof with duct tape on it.  The officers removed the duct tape, and
Deputy Sissney stated that State’s Exhibit 10 showed rough spots where the
nails used to put the shoe on “ruptured through the lamina on the top of the
hoof”—an indication of lack of proper care.  State’s Exhibit 11 showed a piece
of plastic the officers found bound underneath the hoof when they removed the
duct tape—it looked like the bottom of a milk jug that had been cut off.  When
the plastic fell off, a “green sock mess” fell out underneath it.  The mess was
green pus, and Deputy Sissney testified that he did not think he had ever
smelled “that particular smell associated with a live animal.  It was—it was
nauseating.”  He clarified, “[I]t smelled like necrosis, like dead tissue and
infection.”

Ben’s front right hoof injury was
severe and very limiting for his mobility.  Ben’s hooves were also severely
overgrown and had chipped and split, and, with regard to State’s Exhibit 4, a
photo showing Ben’s hooves, Deputy Sissney stated, “You can see this
was—and—and it has been that way for some time, because even places where you
have chips and cracks, now they have rounded off from—from walking, you know. 
So even some of the—this has been a long time in forming.”  The photos also
showed that Ben did not have appropriate bedding for a horse with a hoof injury.
 Further, because of Ben’s muscle degradation, his ribs had fallen and sunken
to the point that he could not breathe at full capacity.

Dr. Swanton said that Ben had a body
condition score of one—the bottom of the body condition score scale.  He was unable
to bear full weight on all four limbs; in her written report, Dr. Swanton noted
that most of the sole wall on Ben’s abscessed foot was peeling away and a
deeply penetrating hole was present.  Ben’s toe length was excessive, which
could affect the hoof wall and cause laminitis or tearing of the hoof wall.[2]
 Dr. Swanton cleaned the hoof with a hoof pick, probed it to determine the
actual depth of the abscess, and checked for pain sensation to determine if it
was a new wound.  She determined that the abscess was “chronic,” which she
defined as “[l]onger than a couple of weeks,” based on the scab formation on
the abscess and the hoof’s condition.

Dr. Swanton explained how she would
treat the horse’s abscess if he had come to her as a patient:

The first thing I would have done—well, initially
would be to pull the shoes, have the feet trimmed to the correct length, apply
new shoes for support, and also apply a hospital plate, which is basically a
metal plate underneath the shoe.  And then pack—pack gauze and medication up
inside of there to help heal that abscess.

 

And the only reason why I say
that is because when it’s as bad an abscess as this particular one was, it
actually is infecting the bone of the last digit, and so it needs more than
just your typical what-you-do-for-an-abscess duct tape covering.

Ben’s bone had become infected, which
Dr. Swanton said would have been very painful.[3]
 In Dr. Swanton’s opinion, Ben had not been receiving adequate care to maintain
a good state of health—he was in pain and “was very, very thin.”[4]

          In her written report, Dr.
Swanton stated,

With his physical appearance and care of the feet on
this horse alone, [i]n my professional opinion I can honestly say that this
horse has not reasonably been provided with the necessary food to maintain his
body condition, nor the care that is necessary to maintain his feet or take
care of his de-worming needs to the extent required to maintain him in a state
of good health.  It should also be noted that this horse’s feet were severely neglected
causing unjustifiable pain and suffering for a long period of time.

During trial, Dr. Swanton explained
her comment about Ben undergoing unjustifiable pain and suffering by stating
that a call to a farrier could have remedied the abscess.  Dr. Swanton said
that a farrier charges around $30 for a trim.

2.  Count 2:  Bay Paint Colt

State’s Exhibits 18 through 22 showed
a bay paint colt whose eyes bugged out and who was thin along the edge of his
muscles.  With regard to the colt’s hooves, shown in State’s Exhibit 20, Deputy
Sissney stated, “They’re very overgrown, cracked, split, chipped out in
places.  I’m not sure that this horse is in a position yet of being—not being
able to walk around, but it’s getting pretty close, especially with—you can see
where this is actually grown out and beginning to roll under now,” showing lack
of proper care.

Dr. Swanton said that the colt’s body
score was a four and that he had the pot-bellied appearance characteristic of a
horse with a lot of parasites; his lab results showed that he had one of the
largest parasite counts of all seven of the horses.  Dr. Swanton testified that
the worms could have easily been removed by using commercial de-wormer from a
feed store if the horse had been on a regular de-worming schedule.  Her
conclusion was that the colt had not been receiving adequate care to maintain
its good health, based on the parasite load.  On cross-examination, Dr. Swanton
testified that it takes between twenty-four and forty-eight hours for a
de-worming treatment to decrease the parasite level and that such a treatment
lasts for up to two or three weeks, depending on the worms’ life cycles.  She
said that with the amount of parasites he had, the colt would probably have
required more than one treatment to rid him of the worms, but she also agreed
that if the colt had received a de-worming treatment, he would have been fine
within twenty-four hours.

3.  Count 3:  Bay Quarter Horse Gelding

State’s Exhibits 23 through 27 show a
bay quarter horse gelding.  Deputy Sissney testified that the horse had bugging
eyes, showing there was no fat reserve built up behind the eyes to keep the
lids pushed out the way they needed to be, the horse’s scapular ridge could be
seen even through its long winter coat, and his neck was very thin.  State’s
Exhibit 25 is a photo of the bay quarter horse gelding’s hooves’ cracks,
splits, and chips along the front edges, showing a distinct lack of proper care
for the animal, according to Deputy Sissney.  State’s Exhibits 26 and 27 show
that the horse was in the same poor condition as the other horses—his ribs
showed, and his musculature had degenerated.

Dr. Swanton gave the horse a body
condition score of two and said that he appeared to have suffered significant
muscle loss.  He did not have parasites, but he had a “pretty high white [cell]
count of 17,500,” indicating that he was fighting an infection.  She also said
that this horse, based on his physical appearance, did not appear to be
receiving adequate nutrition to maintain himself in a good state of health,
“and his blood work basically confirmed that.”

4.  Count 4:  Black Mare

State’s Exhibits 28 through 31 show a
pregnant black mare.  Deputy Sissney stated that the mare’s photo revealed that
her muscles had degraded, her neck was rounded where there was nothing filling
in between the trachea and the spine area, her eyes were bugging, and there was
a general lack of tissue in her face.  Her mane was unkempt and full of burrs. 
Her hooves had not received proper care, and Deputy Sissney stated, “There’s a
crack . . . that runs all the way up into that hoof line in that hoof,” which he
said was painful for the horse, like a human splitting a fingernail.  He opined
that the mare had not been receiving the necessary food, water, or care to
maintain her in good health.

Dr. Swanton gave the mare a body
condition score of four and said that she had normal bloodwork, although she
carried a large parasite load.  Dr. Swanton said that she would have liked the
mare’s body condition score to be higher “because in the next trimester the
foal will require a significant amount of nutrients from the mare, and that
body condition score will lower if not fed appropriately.”  Based on the fecal
exam, Dr. Swanton concluded that the mare was not receiving adequate de-worming
to maintain herself in a good state of health.  Two days following her exam,
the mare lost her fetus.

5.  Count 5:  Princess

State’s Exhibits 32 through 41 show Princess,
an old gray female pony with a very emaciated body.  Deputy Sissney said that Princess
was unkempt, with a lot of matting and burrs stuck in her coat.  He
acknowledged that “[d]ue to her advanced age it wouldn’t be uncalled for to see
her a little bit on the thin side,” but he also said that Princess should have
been “not near as thin as we found her that day.”  State’s Exhibits 33 through
38 show in gruesome detail that Princess was severely emaciated as well as
suffering from the same lack of care as the other horses.  Deputy Sissney
stated that it takes a long period of neglect for a horse’s hooves to reach the
poor condition that Princess’s hooves were in.

Dr. Swanton gave Princess a body
condition score of 1.5.  Dr. Swanton said that a horse of that age would
require a higher nutrient content in her feed because she would not be able to
process the feed like a young horse.  Princess’s hooves were not well
maintained, and she had a very large number of parasites.  Dr. Swanton opined
that Princess was not receiving adequate food and water to maintain her in a
good state of health.

6.  Count 6:  Gray Fine-boned Mare

State’s Exhibits 42 through 46 showed
a pregnant gray fine-boned mare with the same body condition and lack of proper
hoof maintenance as the other horses.  State’s Exhibit 46 also showed that the
gray fine-boned mare had severe diarrhea, which Deputy Sissney testified could
be life-threatening if the horse did not get enough water or nutrition to fight
it off.

Dr. Swanton gave the mare, who was
nine months into her eleven-month pregnancy, a body condition score of two and
said that a body condition score of two was not acceptable for a pregnant
horse.  The mare was sick and suffering from edema (fluid pooling) due to low
protein in her body.  Dr. Swanton concluded that the mare was not receiving an
adequate amount of nutrition to maintain a pregnant mare in good health.

7.  Count 7:  Grulla Mare

State’s Exhibits 47 through 51 show a
grulla mare.  She suffered from the same problems as the other horses regarding
her thinness and lack of appropriate muscle covering.  Dr. Swanton gave the
grulla mare a body condition score of four, stating that she was in pretty good
condition compared to some of the others, even though she had a high parasite
load.

8.  Summary

Deputy Sissney explained that “none
of these animals were lively.  None of them were—they just stood there.  They
were just like, you know, sacks of meat on legs.”  In contrast, he said that
the general personality of a horse that has received good care is inquisitive, stating
that 

they’re going to come up to you as probably as much as
they want to see what you’re doing.  They’re going to want to know why you’re
there. . . .  You know, if they’re a friendly horse, they’re going to follow
you around wherever you’re going, you know, wanting you to feed them, wanting you
to pet them, wanting to be close to where you are.

Deputy Sissney said that when horses
have not received the necessary food, water, or care to keep them in a good
state of health, they do not maintain a friendly, lively personality.  Rather,
they become very withdrawn, as these horses were.

Deputy Sissney and Dr. Swanton both
stated that they did not know when Pointon acquired any of the horses.  Pointon
bought and sold horses, and she told Deputy Sissney that she acquired horses at
sale barns and then brought them home to get them into shape to sell.[5] 
Deputy Sissney said that his department investigates around four animal cruelty
reports a week and that the decision to seize animals is based on the totality
of the circumstances but “[t]he prolonged and systematic lack of proper care to
the hoofs and teeth weigh[ ] a lot more heavily than an empty water barrel.”  Deputy
Sissney stated that none of the seven horses had the necessary food, water, or
care to maintain them in a good state of health.

9.  Post-Seizure

After the horses were seized, they
were placed in the care of Mr. Webster at the Webster Ranch in Ponder before
being transferred to Hope for Horses, a nonprofit equine rescue sanctuary.  Anastasia
Keyser, the nonprofit’s president and founding director, said that she became
the seven horses’ caretaker after the seizure and was involved in their
rehabilitation.[6]

Keyser said that Ben was in “very,
very poor shape” when he came into her custody, stating, “[h]e was barely able
to walk.  His feet were extremely long.  They hadn’t been trimmed or anything
in a very long time.  He even still had shoes on his front feet.  And he had
abscesses and he was extremely underweight.”  Keyser testified that her
veterinarian and a farrier worked together to sedate Ben and trim his feet.  When
her veterinarian initially cleaned the abscess, he found additional
abscesses—four to five in each front foot.  It took about a month to heal the
first abscess and then Ben went for a month or two without abscesses, but he
was abscess-prone because of his laminitis,[7]
and the abscesses recurred five to ten times.  Ben was never without pain.  Ben
was euthanized in July 2010 after a veterinarian who specialized in foundered
laminitic horses was unable to help him.[8]

Keyser took the photo of the gray
pony, Princess, in State’s Exhibit 41 in September or October 2009.  State’s
Exhibit 41 showed Princess eating chopped alfalfa.  Keyser said that Princess
also received soft pellets in her diet and that Princess was still in her
custody, was in a good state of health, was on regular parasite treatment, and
saw a farrier every six to eight weeks.  A photo of the bay quarter horse
gelding taken in May 2009—State’s Exhibit 186—was shown to the jury, as were
photos of the black mare taken in September or October 2009—State’s Exhibits
187 and 188.  State’s Exhibits 189 and 190, from September or October 2009,
showed the gray fine-boned mare post-adoption.  State’s Exhibits 191 and 192
contained photos of the grulla mare taken in September or October 2009.  Keyser’s
veterinarian adopted the grulla mare.  These photos showed that these horses were
no longer emaciated and that they were clearly healthy and cared for.

C.  Pointon’s Arrests and the Seizure
of the Horses

Deputy Sissney testified that he made
contact with Pointon on March 6 after her arrest on outstanding warrants for
“animals at large” to check on the welfare of Pointon, her daughter, and her
animals while she was in custody.  He asked Pointon who was going to take care
of her horses while she was in jail on her warrants, and Pointon told him that
Shannon Flanagan would take care of them.  Pointon had been staying at
Flanagan’s house.  Pointon did not say anything to him about having water or
hay or other food for the horses on her three-acre property on FM 2450 (the FM
2450 property).

Deputy Sissney talked with Flanagan
to determine whether she was going to bring food and water to the horses at the
FM 2450 property.  Flanagan brought food and water for the horses that weekend.[9] 
Pointon was released on March 7.  Pointon called Deputy Sissney on March 9 and
told him that she had moved some of the horses from the FM 2450 property out to
her new address on Klein Road and that she had some hay delivered.

On March 10, deputies seized Pointon’s
horses and arrested Pointon at Flanagan’s house.  Deputy Sissney testified that
the decision to seize the horses was based on “a prolonged systematic lack of
care for the[ ] animals.”

1.  FM 2450 Property

Deputies began the seizure
proceedings at the FM 2450 property.  There were no horses there, and the
property appeared to be abandoned—the electric meter had been pulled from the
meter box, the side door on the south side of the residence was standing ajar,
and the inside of the house appeared to have been ransacked with clothes “in
piles, things pulled off of hangers.”  Deputy Sissney said that there was no
hay at the FM 2450 property.  The water troughs were empty.  He also did not
find any supplemental feed for the horses, such as grain, oats, or pellets.

The trial court admitted into
evidence photos of the FM 2450 house and its surrounding acreage.  State’s
Exhibit 79, a photo of the pasture outside the FM 2450 house, shows no
supplemental grazing pasture and there is nothing for the horses to eat in the
pasture.[10] 
State’s Exhibit 80 shows a water trough containing water with debris and algae
floating in it; according to Deputy Sissney, it would not be adequate or
healthy for the horses to drink.  There was no horse feed in the shed.

2.  Klein Road Property

Pointon’s new address on Klein Road
was the deputies’ next stop.  No one was home, but there were ten horses there,
and they seized them.

The Klein Road property had a house
and barn with surrounding pastures, but Deputy Sissney did not know whether the
pastures belonged to the Klein property.  Three of the ten horses were in the
front round pen, and the other seven were scattered in different stalls in the
open barn area.  A rope held each animal in its individual stall.[11]

The jury viewed photos of the Klein
Road residence, the corral in front of the property, and the stable area.  None
of the stalls in the stable had doors on them.  State’s Exhibit 113 shows an
empty water bucket hanging on the inside of a stall.  State’s Exhibit 114 shows
the inside of that stall with a pony in it; Deputy Sissney said that it looked
like the stall had not been mucked out for a couple of days.

Two other photos showed buckets
containing water that were sitting on the ground, which Deputy Sissney said
would make it very easy to contaminate the water with feces.  State’s Exhibit
130 was a photo of one of the horses at the Klein Road property, showing that
it had gotten out of its stall while the officers were trying to round up some
of the other horses.  Other photos showed FM 2164, a major north-south byway in
the north part of the county, in the background, and the lack of the fence,
constituting a danger to the horses if they escaped onto the road.  The
officers could not access the Klein Road house so they did not know if the
electricity was turned off there, although the meter bore a green removal tag.

During cross-examination, Deputy
Sissney admitted that there was grass on the ground at the Klein Road residence
and two round bales of hay in the barn.  On redirect, he described the hay at
the Klein residence as “very old.  It had a lot of mold and dust and mildew
when we began to pull part of it off.  It was very poor quality.  Probably very
low nutritional value left in it because of the age of the hay.”

3.  Flanagan’s Property

Pointon had brought six of her horses
to Flanagan’s about two weeks prior to her arrest.  The officers went there
after visiting the Klein Road property.  Flanagan pointed out the horses that
belonged to Pointon.  Pointon was arrested at Flanagan’s house.

Flanagan, who teaches horseback
riding at her riding academy, described Pointon’s horses as having long coats
with dull hair and said that they looked “a little bit wormy.”[12]
 Flanagan said that a horse receiving good quality feed will typically have a
shiny coat, even if it still has its winter coat, because of the nutrients in
the feed; she said that worms can contribute to lack of shine and that when a
horse has a dull coat, “that’s usually an indicator that there’s something
going on.”  One of the first things Flanagan did for the horses when they
arrived on her property was to de-worm them because worms can be dangerous to a
horse.

Flanagan stated that the horses
needed to be seen by a farrier because when horses’ hooves are not regularly
trimmed, it can cause the horses pain, and that it appeared that most of the
horses had not seen a farrier in a very long time.  Flanagan had a farrier come
out, but he did not tend to all of the horses.  Flanagan paid for the farrier
out of her own pocket.  Flanagan stated that two of Pointon’s horses were
pregnant; one had her foal while on Flanagan’s property.

During the three weeks that the six
horses were on Flanagan’s property, they had access to fresh hay, received
grain twice a day, and gained weight—Flanagan estimated that the bigger horses
gained around 100 pounds.  She fed the horses “Equine Senior,” even though
these horses were not old, because the pellets were soft and easier to digest,
so it would be easier for the horses to gain weight.  Flanagan said that the
horses looked like they needed the nutrients in the Equine Senior because to
her they appeared to be severely nutrient-deprived, in addition to needing a
farrier’s attention for their hooves.

Officers removed five of Pointon’s
horses from Flanagan’s property.  They did not transport the mare and her week-old
foal because they were afraid the foal would injure itself in transit.  Flanagan
was left in charge of those two horses.  Flanagan fed them, had them seen by a
farrier, and said that she would have taken them to a veterinarian if needed.  Hope
for Horses took the mare and foal after the foal was weaned.

Flanagan testified that she had known
that Pointon had a horse with a hoof problem because she had been with Pointon
at a feed store when Pointon bought some pads for the horse’s feet.  Pointon
told her about three weeks before the horses were removed that she had acquired
the horse from a shipper in California and that the horse had an abscess.  The
horse with the abscess was never on Flanagan’s property, and Flanagan opined,
based on working with horses her entire life, giving riding lessons for
twenty-five years, her degree in animal science, and her status as a registered
veterinary technician, that padding the horse’s foot was not the proper way to
treat an abscess on a hoof.  Flanagan explained that when one of her horses had
an abscess, the farrier would come out, drain the abscess, soak the foot in
Epsom salt to draw out the infection, pack the foot with a drying agent, and
then repair the horse’s sole; depending on the severity of the abscess, the
horse might also be given an anti-inflamatory for pain.  Flanagan said that
abscesses are not usually fatal in horses and that for an average healthy
horse, from abscess diagnosis to being healthy again takes around a week.

D.  Pointon’s Neighbors’ Testimonies

Max Redding, Lewisville Police
Officer Max Gherke, and Karen Harkins lived near Pointon’s three-acre property
on FM 2450.

Redding testified that he and his
family had lived next to Pointon’s property since July 2006, when Pointon had
three to four horses.  He had noticed an increase over time in the number of
horses she kept on her property, which caused him concern about possible health
issues that could spread across the property line.  Redding also noticed that
the horses were thin, and he did not see hay being delivered weekly or
bi-weekly.

Officer Gherke testified that he
shared a fence line with Pointon and that they had been neighbors for two or
three years.  He did not recall the number of horses Pointon had when she first
moved in but said that her herd had grown to around fifteen.  Officer Gherke
said that this concerned him because the horses did not appear to be taken care
of, were kept in a confined space, and did not seem to get food or water on a
regular basis.  Based on his conversations with other neighbors, he did not
call animal control because he was confident that animal control had been
notified about the horses’ condition.  He recalled seeing a horse with a
duct-taped hoof for a while, but he did not recall how long Pointon had had the
horse.

Officer Gherke said that he saw hay
delivered to the property before the seizure.  He did not know the people who
had delivered the hay—a woman who was not Pointon had come to his house
inquiring about the horses’ condition and when she and her husband returned,
they delivered hay bales and Officer Gherke provided water for the horses
because Pointon had no electricity to run her pump.[13]

Harkins testified that she lived down
the road from Pointon.  She had agreed to let six or seven of Pointon’s horses
use Harkins’s four-acre back pasture for $200 per month.  Harkins said that
Pointon was still responsible for providing the horses with food and giving
them water.  Harkins said that at one point, in the fall or winter of 2008, she
and her husband noticed that the horses were not being watered, so they started
watering them for Pointon.  They also noticed that food was not being brought
on a regular basis.

Harkins said that it would take the
horses three to four days to go through a bale of hay but that hay was not
delivered every three to four days—a long enough time elapsed between
deliveries that she worried about the horses getting fed.  She and her husband
noticed that the horses’ ribs were starting to show more and that their hip
bones were becoming more obvious; she did not remember them being so thin when
they were first put in her back pasture.  The horses’ condition became bad
enough that she worried that there would be animal cruelty charges, so her
husband wrote Pointon a letter on February 27, 2009, telling her about their
concern for the animals’ welfare and telling her that they wanted them removed
from the property.  By that point, Pointon had not paid the horses’ rent in
several months, and the Harkinses had previously tried to contact Pointon by
email, text message, and voice mail.

After delivering the February 27
letter and before sending another letter on March 5, Harkins and her husband
called the sheriff’s department about the horses “just to let them know what the
situation [sic] kind of ahead of time.”  The horses were removed from her
property on March 9.  Harkins said that based on her notification and
conversations with Pointon before the horses were removed from her property,
she believed that Pointon knew about the horses’ condition.

E.  Hay Delivery

Contrary to Pointon’s neighbors’
testimonies, Randy Bentley, who worked at Schertz Feed in Sanger, testified
that he sold and delivered around two or three round bales of hay—weighing 900
to 1,200 pounds each—per week to Pointon.  He did not have any records or
receipts because Pointon had a deal with the feedstore’s owner:  the owner had
hay near the FM 2450 property and he would deliver hay to her when she called.

With regard to the hay at the Klein
Road residence, Bentley said that he knew hay had been delivered to the Klein
Road residence at least once.  On cross-examination, Bentley admitted that when
previously asked by the State if it would surprise him to learn that the hay
was old, he had said that it would not surprise him.  He also admitted that he
had told the State that it would not surprise him because that was what Pointon
had specifically ordered.

F.  Verdict

A jury found Pointon guilty on each
count and assessed her confinement at 365 days for each count.  They assessed a
fine on count one of $2,500; a fine on count two of $1,000; a fine on count
three of $1,500; a fine on count four of $2,000; a fine on count five of
$1,500; a fine on count six of $2,000; and a fine on count seven of $1,000.  The
jury also recommended to the trial court that Pointon be granted community
supervision.  The trial court sentenced her in accordance with the jury’s
verdict, suspended the sentences, and placed Pointon on twenty-four months’
community supervision.  This appeal followed.

III.  Sufficiency

In her sole point, Pointon argues
that the evidence is insufficient to support her conviction for cruelty to
livestock animals.

A.  Standard of Review and Applicable
Law

In our due-process review of the
sufficiency of the evidence to support a conviction, we view all of the
evidence in the light most favorable to the verdict to determine whether any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99
S. Ct. 2781, 2789 (1979); Isassi v. State, 330 S.W.3d 633, 638 (Tex. Crim.
App. 2010).

Pointon was charged with
intentionally or knowingly “fail[ing] unreasonably to provide necessary food,
water, or care for a livestock animal in [her] custody.”  See Tex.
Penal. Code Ann. § 42.09(a)(2).  A jury may infer a culpable mental state from
the circumstances surrounding the cruelty to animals offense.  Martinez v.
State, 48 S.W.3d 273, 276 (Tex. App.—San Antonio 2001, pet. ref’d) (citing Pine
v. State, 889 S.W.2d 625, 629 (Tex. App.—Houston [14th Dist.] 1994, pet.
ref’d), cert. denied, 516 U.S. 914 (1995)).  “Necessary food, water, or
care” includes food, water, or care “provided to the extent required to
maintain the livestock animal in a state of good health.”  Tex. Penal Code Ann.
§ 42.09(b)(6).  “The quantity and quality of food necessary to sustain a
horse is a matter of common knowledge among persons familiar with the care of
horses.”  Cross v. State, 646 S.W.2d 514, 515–16 (Tex. App.—Dallas 1982,
pet. ref’d) (defining “necessary food” as “food sufficient in both quantity and
quality to sustain the animal in question”).

B.  Analysis

The testimony of Dr. Swanton, Deputy
Sissney, and Flanagan establish that the horses had not been receiving
sufficient food and care, based on their poor physical conditions, including
their low body condition scores, emaciation, parasites, and lack of adequate
hoof maintenance.  Further, Pointon’s neighbors testified that they either did
not see hay being delivered regularly for Pointon’s horses or that they were
concerned about the horses receiving enough to eat.  And while Bentley, the
feed store worker, testified that the feed store delivered two to three round
bales of hay to Pointon each week in 2008 and 2009, he also admitted that the
hay delivered to the Klein Road house was old because that was specifically
what Pointon had ordered, and other witnesses testified that old hay would not
provide adequate nutrition.  Furthermore, Deputy Sissney and Harkins testified
about the lack of available water or clean water for the horses, and Officer
Gherke testified that Pointon could not use her water well at the FM 2450
property because her electricity had been shut off.

Pointon argues that the evidence is
insufficient because no witness knew when she “[came] into possession of the
horses or the condition of the horses when she acquired them.”  She complains
that for her to maintain the horses in good health, the horses had to attain
good health first, and she asserts that there is no evidence that the horses
were ever in a better state of health.  However, even if the horses had been in
poor condition when she received them, the photographic evidence showing the
near-miraculous recovery of all of the horses but Ben after the horses received
food, water, and care from Hope for Horses belies this argument.  Further,
Flanagan’s testimony established that Pointon was aware of Ben’s abscess at
least three weeks prior to the seizure of the horses and that a properly
treated abscess can heal in a week, and Dr. Swanton testified that a farrier—which,
based on their overgrown hooves, none of the horses had seen in a long time prior
to the seizure—could treat an abscess.  The jury could have found that Pointon
allowed Ben’s condition to reach irremediable deterioration before he was
seized from her based on her failure to provide him with necessary care.  And,
as to all of the horses, the jury could have reasonably inferred that Pointon
knew of the inadequacy of the food, water, and care that she supplied before
the March 10 seizure based on their physical appearances as well as Harkins’s February
27 and March 5 letters sent to Pointon expressing concern about the horses.  Viewing
the evidence in the light most favorable to the verdict, the jury could have
found the essential elements of each count beyond a reasonable doubt.  See
Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Isassi, 330 S.W.3d at
638.  Therefore, the evidence is sufficient to support Pointon’s conviction on
all seven counts of cruelty to livestock animals, and we overrule her sole
point.

IV.  Conclusion

Having overruled Pointon’s sole
point, we affirm the trial court’s judgment.

 

 

                                                                             BOB
MCCOY

                                                                             JUSTICE

 

PANEL:  WALKER, MCCOY, and GABRIEL,
JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  December 15, 2011









[1]See
Tex. R. App. P. 47.4.





[2]Dr.
Swanton testified that abscesses can be caused by having too long a hoof and
they are very common in horses whose feet are not regularly trimmed.  Further,
a bruise to the sole of the foot due to stepping on a rock or a penetrating
wound such as stepping on a nail could cause a hoof to develop an abscess.  She
explained that an abscess is “a pocket of pus” that builds bigger and bigger,
causing pressure and pain.





[3]On
redirect examination, Dr. Swanton agreed that the shoeing pad, plastic, and
duct tape that had been put on Ben’s abscess was the equivalent of a human
putting a Band-aid over a wound with a deep infection that required treatment. 
State’s Exhibits 177 and 178 were x-rays of Ben’s foot, showing inflammation of
the bone from the abscess.





[4]Ben
also had a couple of parasites, but Dr. Swanton agreed on cross-examination
that his parasite count could potentially reflect that he was between
de-worming treatments.





[5]According
to Shannon Flanagan, another witness, the horses that Pointon bought at horse
auctions were usually not in good shape.





[6]Keyser
said that the goal of Hope for Horses is to rehabilitate horses and then put
them up for adoption.  Before rescue horses can be adopted, the nonprofit gets
the horses to the proper weight, makes sure there are no underlying physical
conditions that are left untreated, makes sure that the horses’ teeth and feet
are in good condition, and updates their shots, de-worming, and Coggins test,
which is a test to make sure a horse does not have equine infectious anemia.





[7]Keyser
testified that laminitis can be caused metabolically by not giving a horse
proper care and starving it or giving it too much protein too quickly.  It can
also be caused physically through an injury.  Laminitis can be permanent if
there has been rotation in the horse’s coffin bone; there was rotation in Ben’s
coffin bone when Keyser took custody of him.  Deputy Sissney testified that the
bone is called the “coffin bone” because “if you have a problem with that bone
it means the horse needs to be put down, dead.”





[8]Dr.
Swanton testified that the decision to euthanize would be based on the horse’s
quality of life and how well he responded to treatment.





[9]Flanagan
said that she received a phone call from an animal control officer in the
middle of the night and that she agreed to bring food and water to the horses
at the FM 2450 property.





[10]During
cross-examination, Deputy Sissney agreed that the photo of the pasture in
State’s Exhibit 85 showed a round bale of hay, but he did not know when that
photo had been taken or by whom.  There were no horses on the property on March
10, and State’s Exhibit 85 shows a horse standing near the bale of hay.





[11]State’s
Exhibits 21 and 22 are photos of the bay paint colt at the Klein Road address
where he was seized.





[12]Flanagan
explained that when a horse has worms, it will appear to have a pot belly and
will not “look as fleshy everywhere like a horse that’s in good condition.”





[13]The
electricity had been turned off at Pointon’s house, and her well pump would not
work.